DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
By:   JESSICA FEINSTEIN
       Assistant United States Attorney
       One Saint Andrew's Plaza
       New York, New York 10007
       Tel. (212) 637-1946

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
:
UNITED STATES OF AMERICA,
:
        Plaintiff,
:
                              :     VERIFIED COMPLAINT FOR
      -v.-                          FORFEITURE
:
                                        21 Civ. ___ (___)

A LATE 12TH CENTURY KHMER SANDSTONE   :
SCULPTURE DEPICTING STANDING
PRAJNAPARAMITA,                                  :
:
A 7th TO 8th CENTURY KHMER SANDSTONE
SCULPTURE DEPICTING STANDING SURYA,   :

AN IRON AGE DONG SON BRONZE BELL,      :

A 17th TO 18th CENTURY SANDSTONE LINTEL  :
DEPICTING THE SLEEP OF VISHNU AND
BIRTH OF BRAHMA,                                 :

        Defendants in Rem.            :

:
------------------------------------X

       Plaintiff United States of America, by its attorney Damian Williams, United States Attorney for the Southern District of New York, for its verified complaint, alleges, upon information and belief, as follows:

## I. NATURE OF THE ACTION

1. This action is brought by the United States of America seeking forfeiture of all right, title and interest in the following antiquities, currently located in the possession of a museum located in Denver, Colorado (the "Museum"):

    a. A late 12th century Khmer sandstone sculpture depicting standing Prajnaparamita, the goddess of transcendent wisdom (the "Prajnaparamita"), approximately 59 inches high and 15 inches wide. A photograph of the Prajnaparamita is attached hereto as Exhibit A.

    b. A 7th to 8th century Khmer sandstone sculpture depicting standing Surya, the sun god (the "Surya"), approximately 25 inches high and 9.5 inches wide. A photograph of the Surya is attached hereto as Exhibit B.

    c. An Iron Age Dong Son bronze bell (the "Bell"), approximately 12.5 inches high and 7.5 inches wide. A photograph of the Bell is attached hereto as Exhibit C.

    d. A 17th to 18th century sandstone lintel depicting the sleep of Vishnu and the birth of Brahma (the "Lintel,"), approximately 52 inches long and 18 inches wide. A photograph of the Lintel is attached hereto as Exhibit D.

    e. The Prajnaparamita, the Surya, the Bell, and the Lintel are the "Defendants in Rem."

2. The Museum has voluntarily agreed to relinquish possession of the Defendants in Rem to the United States of America in order for them to be repatriated to the Kingdom of Cambodia, and has waived all claims of right, title and interest in the Defendants in rem.

3. The Defendants in Rem are subject to forfeiture pursuant to 19 U.S.C. § 1595a(c) because there is probable cause to believe that the Defendants in Rem are stolen property introduced into the United States contrary to law; 18 U.S.C. § 545 because there is probable cause to believe that the Defendants in Rem are merchandise which has knowingly been brought into the United States contrary to law; and pursuant to 18 U.S.C. § 981(a)(1)(C) because there is probable cause to believe that the Defendants in Rem are property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 2314.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

5. Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A).

## III. FACTUAL BACKGROUND

### The Looting of Cambodian Antiquities

6. From the mid-1960s until the early 1990s, Cambodia experienced continuous civil unrest and regular outbreaks of civil war. During these times of extreme unrest, Cambodian archeological sites suffered serious damage and widespread looting. This looting was widely publicized and well-known to participants in the international art market.

7. Looted artifacts usually entered the international art market through an organized looting network. Local looters, often working with local military personnel, would remove statues and architectural elements from their original locations, sometimes breaking and damaging the antiquities in the process of excavation and transportation. The antiquities would be transported to the Cambodia-Thailand border and transferred to Thai brokers, who would in turn transport them to dealers of Khmer artifacts located in Thailand, particularly Bangkok.

These dealers would sell the artifacts to local or international customers, who would either retain the pieces or sell them on the international art market.

8. Widespread looting of Khmer and Cambodian antiquities continued after the establishment of the modern Cambodian state in 1993. For example, in 1998, the archeological site of Banteay Chhmar in Cambodia experienced significant, organized looting. In or about 2013, a group of researchers studying antiquities trafficking in Cambodia reported continuing, although abated, looting at archeological sites.

### The 1970 UNESCO Convention

9. The United States and Cambodia are both parties to the United Nations Educational, Scientific, and Cultural Organization ("UNESCO") 1970 Convention on the Means of Prohibiting and Preventing Illicit Import, Export, and Transport of Ownership of Cultural Property (the "1970 UNESCO Convention"), which was drafted to combat the illegal trade in cultural property. The 1970 UNESCO Convention requires state parties to take measures to prevent the illegal import or export of cultural property, and to take appropriate steps to recover and return cultural property at the request of the country of origin. The promulgation of the 1970 Convention has broadly informed the circumstances in which museums and institutional actors will acquire art and antiquities: most museums in the United States, for example, will not acquire cultural patrimony removed from its country of origin after 1970 unless its provenance is fully documented, and its removal is with the express approval of and in conformance with the laws of the country of origin.

10. In the United States, the Cultural Property Implementation Act ("CPIA"), 19 U.S.C. § 2601, *et seq.*, implemented the 1970 UNESCO Convention. In or about December 1999, pursuant to the 1970 UNESCO Convention, Cambodia submitted a request to the United

States to impose restrictions on the importation of Khmer cultural objects into the United States. That year, pursuant to the CPIA, the United States declared an emergency embargo on the importation of stone Khmer antiquities into the United States where such antiquities had been exported from Cambodia after the date of the embargo (the "CPIA Embargo"). In or about 2003, the United States and Cambodia entered into a formal Memorandum of Understanding, expanding the 1999 emergency import restrictions to include bronze Khmer antiquities.

## The Looting of the Defendants in Rem

11. Investigators working for the Cambodian Ministry of Culture and Fine Arts and the United States Government have interviewed a Cambodian national who was previously engaged in the theft and looting of antiquities from Cambodian temples and archeological sites ("Looter-1"). Looter-1 has described and identified sculptures that Looter-1 helped to illicitly remove from archeological sites. The information Looter-1 has provided has been corroborated by, among other things, archeological evidence, photographs, and other individuals involved in looting. Looter-1 told investigators the following, in substance and in part:

    a. Looter-1 joined the Khmer Rouge at the age of approximately 10 years old. Looter-1's father became involved in the looting of temples, and Looter-1 began assisting him when Looter-1 was around 18 years old. From in or about the 1980s until the late 1990s, Looter-1 developed an expertise in the location, identification, and removal of Khmer cultural objects from various temples and other sites around Cambodia. By the 1990s, Looter-1 was leading a group of approximately 450 people working in multiple teams to loot temples and archeological sites in Cambodia.

      b.      Looter-1 sent many of the cultural objects that Looter-1 looted to one of three brokers in antiquities who lived close to the Thai border (including "Broker-1" and "Broker-2"). Looter-1 was aware that Broker-1 and Broker-2 sold antiquities to a man whom Looter-1 knew as "Sia Ford,"[1] a foreign national with a large collection of Khmer antiquities in Bangkok, Thailand. Looter-1 never personally met "Sia Ford."[2]

      c.      Looter-1 reviewed photographs of the four Defendants in Rem, and recognized them as antiquities that Looter-1 and his team had stolen from archeological and religious sites in Cambodia.

### The Antiquities Dealer Douglas Latchford

12.      In October 2019, a grand jury in this District returned a sealed felony indictment charging Douglas Latchford, a/k/a "Pakpong Kriangsak," with wire fraud conspiracy and other crimes related to a many-year scheme to sell looted Cambodian antiquities on the international art market, primarily by creating false provenance documents and falsifying invoices and shipping documents, including misrepresenting the country of origin of artworks. *See United States v. Latchford*, 19 Cr. 748 (AT) (the "Indictment"). As set forth in the Indictment, Latchford was a prominent collector and dealer in Southeast Asian art and antiquities. In September 2020, the Indictment was dismissed due to the death of Latchford.

13.      As set forth in the Indictment, in order to conceal that Latchford's antiquities were the product of looting, unauthorized excavation, and illicit smuggling, and to encourage sales and increase the value of his merchandise, Latchford created and caused the creation of false

---

[1] "Sia" is a Thai word for "lord," and often used to refer to a wealthy business person.

[2] Broker-1 told representatives of the Cambodian Ministry of Culture and Fine Arts that Broker-1 sold Khmer sculptures to Douglas Latchford, described below.

provenance for the antiquities he was selling. In the context of art and antiquities, provenance refers to records and other evidence documenting the origin and history of ownership of an object.   For example, in order to facilitate the sale and international transportation of Khmer and Cambodian antiquities and to conceal that the antiquities were looted, Latchford provided letters of provenance purported to have been drafted by a particular art collector (the "False Collector") to museums and private collectors interested in purchasing antiquities from Latchford. The letters purporting to be from the False Collector typically falsely claimed that the False Collector acquired the pieces in Vietnam or Hong Kong in the 1960s. The False Collector died in or about 2001. Thereafter, Latchford continued to provide signed provenance letters to prospective purchasers that were purportedly from the False Collector.

14. As set forth in the Indictment, Latchford was closely associated with a particular scholar of Khmer art (the "Scholar").   Over the years, the Scholar assisted Latchford on many occasions by verifying or vouching for the proffered provenance of Khmer antiquities that Latchford was trying to sell.

### The Museum Acquired the Defendants in Rem from Douglas Latchford

15. The Museum acquired the Defendants in Rem from Douglas Latchford.   The Scholar, who was a volunteer research consultant for the Museum, facilitated the sale and donation of the Defendants in Rem, including by vouching for their provenance.

16. As set forth below, Latchford lied repeatedly to the Museum, in particular with regard to the provenance of the Prajnaparamita and the Surya. Latchford provided false provenance for certain of the Defendants in Rem to the Museum, and made multiple misrepresentations—including contradictory statements—regarding when certain of the Defendants in Rem were shipped and imported into the United States.

### The Prajnaparamita and the Surya

17.     In or about May 2000, Latchford agreed to loan the Prajnaparamita and the Surya to the Museum.   Prior to sending the Prajnaparamita and the Surya to the Museum, Latchford told the Museum that he had acquired the Prajnaparamita from the False Collector in June 1999. Latchford provided the Museum with a certificate of ownership purportedly signed by the False Collector stating that the False Collector had purchased the Prajnaparamita in Vietnam between 1964 and 1966.   Latchford also assured a curator at the Museum that the Prajnaparamita had arrived in the United States in June 1999 "before the embargo."

18.     United States Customs and Border Protection records indicate that in June 1999, Latchford made a shipment of goods into the United States. Neither the declared value of the shipment nor the country of origin—Thailand—match the Prajnaparamita and the Surya.

19.     Latchford also provided the Museum with records purportedly showing that the Prajnaparamita and the Surya were shipped from Latchford's Bangkok apartment to London in 1994. These records contradict Latchford's claim that he acquired the pieces from the False Collector in 1999.

20.     On or about May 9, 2000, an incoming shipment notification for the Museum stated that the Prajnaparamita and Suyra were to be picked up from Latchford in Thailand for shipment to Denver, which suggests that the pieces were in fact entering the United States around the time that they were loaned to the Museum in 2000, after the CPIA Embargo was in place. The incoming shipment notification also indicated that the pieces were being shipped to Denver in part through an international air carrier with no domestic flights.

21.     On or about May 25, 2000, Latchford and the Museum signed a Loan Agreement for the Prajnaparamita and the Surya and one other antiquity.   The Loan Agreement stated that

the previous owners of the Prajnaparamita and Surya were "Unknown."

22. On or about September 11, 2000, the Museum purchased the Prajnaparamita from Latchford for $358,000, although its estimated value for insurance purposes was approximately $600,000. On the bill of sale, Latchford represented that he had purchased the Prajnaparamita from the False Collector on "8/4/89"— a different date than Latchford had previously told the Museum.

23. On or about September 22, 2000, a curator at the Museum emailed the Scholar, noting that the 1970 UNESCO Convention had restrictions on objects removed by soldiers during times of war, and asked for more details about when and where the False Collector had purchased the Prajnaparamita and where it was "dug up." In response, the Scholar told the curator that the False Collector "is very ill in a hospital," and that if they needed anything signed by the False Collector, Latchford would have to try to get it. The Scholar added that "[the False Collector] has no idea where it came from" and "[the False Collector] was never a soldier in Vietnam, so this did not come out during the war."

24. On or about November 11, 2004, the Museum purchased the Surya from Latchford for $230,000. The bill of sale stated that Latchford had acquired the Surya from the False Collector "more than 15 years" before the sale. The Museum wired payment for the Surya to Latchford's bank account in New York, New York.

25. In or about 2015, a researcher for the Museum reached out to Latchford to request more information about the False Collector. In response, a person representing themselves as Latchford's secretary sent an email to the Museum, falsely claiming that Latchford was ill and could not respond to the request.

### The Bell and the Lintel

26.     In or about 2005, Latchford donated the Bell and the Lintel to the Museum as gifts. Latchford provided limited provenance information to the Museum for either piece.

27.     Prior to donating the Bell to the Museum, Latchford tried to sell two similar bronze bells to a private buyer in the United States. On or about June 1, 2003, Latchford emailed an agent of the potential buyer images of two "Don Song bells" very similar in appearance to the Bell. Latchford wrote to the agent, in part, that the "bells are quite rare, only 3 or 4 were [previously] known." Latchford explained that "[r]ecently a find was made in the area of Battambang in NW Cambodia" and Latchford "was able to obtain a few." Latchford also stated that he had another Dong Son bell in his apartment in London. Latchford sent the agent photographs of the bells before and after cleaning.   The images of the bells before cleaning show them encrusted with what appears to be dirt and minerals, a sign of recent excavation.

### IV.   CAMBODIA'S OWNERSHIP LAWS

28.     State ownership of Cambodian antiquities such as the Defendants in Rem has been established in various laws dating back to the French colonial era. In 1863, a treaty between France and the Kingdom of Cambodia established Cambodia as a protectorate of France.   In 1884, the concept of private property was introduced through a convention imposed by the French administration.

29.     Also in 1884, a ruling by the French Governor responsible for Cambodia granted the state all territory formerly held by the crown.   While this 1884 ruling made select lands "alienable," the "public domain" remained "inalienable," including those "structures [...] assigned to a public service."

30.     Subsequently, a 1900 decree established a baseline level of protection for art and

archaeology in French Indochina, including Cambodia, and explicitly recognized that such items, including statues, that "exist on or in the soil" of immoveable properties that were part of the "national domain," were similarly part of the national domain.

31.     The 1900 decree also established a system of classifying certain moveable and immoveable property, whose conservation was in the public interest from a historical or artistic perspective.   Under the decree, once thus categorized, these moveables and immoveables received additional protections which, among other things, prohibited their unauthorized alteration, movement, sale, export, destruction, and even restoration.   Furthermore, such property was "inalienable" and "imprescriptible," under penalty of any sale's nullification. Subsequent legislation in 1913 and a decree issued in 1924 reaffirmed the protections set forth in the 1900 decree.

32.     In or about 1925, the classification of French Indochina's objects and sites as historical monuments and objects began in earnest.   First, a May 6, 1925 decree reaffirmed that ownership of statues found on property belonging, *inter alia*, to the Cambodian state, now referred to as the "colonial" rather than "national" domain, was retained by the state. Subsequently, a July 1925 decree, among other things, reiterated the earlier protections regarding classification and expanded upon them.   The July 1925 decree also criminalized violations of the law related to historical monuments and objects.

33.     On May 6, 1947, with independence on the horizon for Cambodia, the King of Cambodia signed a new constitution.   In addition to laying the groundwork for the modern Cambodian state, this charter provided that existing laws "not inconsistent" with its terms "shall remain in force," until replaced by new ones or otherwise repealed.   In a 1950 convention, France transferred the power to protect, classify, and conserve historic monuments to the Royal

Government of Cambodia. Cambodia formally declared and was granted independence in 1953.

34. In September 1972, Cambodia became only the seventh state to ratify the 1970 UNESCO Convention, even though by then the government controlled little more than the Phnom Penh and Angkor regions. Just a few months earlier, Cambodia had also imposed a new constitution, which established the short-lived Khmer Republic. Like its 1947 predecessor, this document contained a provision that preserved the previous government's institutions, until a new framework could be implemented.

35. Since the end of the civil war, the Cambodian government has sought the return of artifacts looted from its temples and archeological sites during or after the civil war.

36. In 1996, Cambodia enacted the Law on the Protection of Cultural Heritage. The 1996 Law was enacted with the purpose of protecting Cambodian national cultural heritage and cultural property against, among other things, excavation, alienation, and exportation. It defines "cultural property" as "any work produced by human agency and any natural phenomenon of a scientific, artistic or religious nature which bears witness to a certain age in the development of civilization . . . and whose protection is in the public interest." 1996 Law, Art. 4. In particular, the 1996 Law prohibits excavation or exportation of cultural property without prior authorization of the state, *see id.*, Art. 40, 51, and declares that "[m]oveable cultural property found by chance is public property." *Id.*, Art. 39.

## V. CLAIMS FOR FORFEITURE

37. Incorporated herein are the allegations contained in paragraphs 1 through 36 of the verified complaint.

38. 18 U.S.C. § 545 provides in pertinent part that "[w]hoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives,

conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law," shall be subject to criminal penalties. 18 U.S.C. § 545 further provides in pertinent part that "[m]erchandise introduced into the United States in violation of this section . . . shall be forfeited to the United States."

39. 18 U.S.C. § 2314 provides in pertinent part that "[w]hoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, the value of $5,000 of more, knowing the same to have been stolen, converted or taken by fraud," shall be subject to criminal penalties.

40. 19 U.S.C. § 1595a(c) provides in pertinent part:

> Merchandise which is introduced or attempted to be introduced into the United States contrary to law shall be treated as follows: (1) The merchandise shall be seized and forfeited if it – (A) is stolen, smuggled, or clandestinely imported or introduced. . . .

41. Pursuant to 18 U.S.C. § 981(a)(1)(C), "any property, real or personal, which constitutes or is derived from proceeds traceable," to a violation of 18 U.S.C. § 2314 is subject to forfeiture to the United States.

42. The Defendants in Rem are subject to forfeiture pursuant to 18 U.S.C. §§ 545, 2314, and 19 U.S.C. § 1595a(c) because there is probable cause to believe that the Defendants in Rem are stolen property introduced into the United States contrary to law.

43. The Defendants in Rem are further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because there is probable cause to believe that the Defendants in Rem are property, real or personal, which constitutes or is derived from a violation of 18 U.S.C. § 2314.

Dated: New York, New York
November 8, 2021

DAMIAN WILLIAMS
United States Attorney for
the Southern District of New York
Attorney for the Plaintiff
United States of America

By: *Jessica K. Feinstein*
JESSICA FEINSTEIN
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
Tel. (212) 637-1946

## **VERIFICATION**

STATE OF NEW YORK )
COUNTY OF NEW YORK :
SOUTHERN DISTRICT OF NEW YORK )

JOHN P. LABBAT, pursuant to Title 28, United States Code, Section 1746, hereby declares under penalty of perjury that he is a Special Agent with the Department of Homeland Security, Homeland Security Investigations; that he has read the foregoing Verified Complaint and knows the contents thereof; that the same is true to the best of his knowledge, information and belief; and that the sources of his information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

_____
JOHN P. LABBAT
Special Agent
Homeland Security Investigations

Executed on this
8th day of November 2021

# **Exhibit A**



# Exhibit B



# **Exhibit C**



# **Exhibit D**

